**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ELIZABETH SMITH,**

               **Plaintiff,**

**vs.**                                   **Civ. No. 06-356  JH/CEG**

**MARK RENTERIA and NARCISO VALDEZ,
Police Officers for Las Cruces, New Mexico, and
BOARD OF CITY COMMISSIONERS OF
THE CITY OF LAS CRUCES, NEW MEXICO,**

               **Defendants.**

## MEMORANDUM OPINION AND ORDER

      This matter comes before the Court on Defendants' *Motion for Summary Judgment* [Doc. No. 32] and *Plaintiff's Motion for Partial Summary Judgment* [Doc. No. 39]. Defendants request summary judgment on both Plaintiff's claim for violation of her rights under the Fourth Amendment (Count I) as well as her claim for malicious abuse of process (Count III). Plaintiff moves for summary judgment on Count I only. After reviewing the law, the evidence presented, and the arguments of the parties, the Court concludes that Defendants' motion should be granted, and Plaintiff's motion should be denied.

## LEGAL STANDARD

      Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim.

*See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v.

Allen*, 522 U.S. 1148 (1998).  "'Instead, the movant only bears the initial burden of 'showing'—that

is, pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving

party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (quoting Fed.

R. Civ. P. 56(e)).  A plaintiff cannot rely upon conclusory allegations or contentions of counsel to

defeat summary judgment but rather must produce some specific factual support of its claim.  *See

Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe

v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(citation omitted).  Upon a motion for summary judgment, a court "must view the facts in the light

most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences

to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997),

*aff'd*, 162 F.3d 1173 (10th Cir. 1998).  If there is no genuine issue of material fact in dispute, then

a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.

*See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. Qualified immunity bars Section 1983 suits against defendants in their individual—but not official—capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officers' conduct violated a constitutional right. *Cf. id.* at 201. The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).

3

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity. *See Medina*, 252 F.3d at 1128. If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)). In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina*, 252 F.3d at 1128 (citation omitted). However, if the nonmoving party successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted).

## FACTS

This case arises from the arrest of Plaintiff Elizabeth Smith ("Plaintiff") on July 30, 2004. The facts, viewed in the light most favorable to the Plaintiff, are as follows. Claudia Smith ("Claudia") is Plaintiff's daughter and was over 18 years of age at the time of the events at issue in this case. At that time, both Defendants Narciso Valdez ("Valdez") and Mark Renteria ("Renteria") were law enforcement officers employed by the City of Las Cruces, New Mexico. On July 30, 2004, at approximately 11:00 p.m., Claudia was walking near a convenience store on South Telshor Boulevard in Las Cruces. She had just come from her home, where she had a verbal dispute with Plaintiff. As a result of the argument, Claudia had decided to play "a malicious joke" by pretending that Plaintiff

4

had hit her and putting on makeup to look like bruises.  When she reached the convenience store she called her friend Erin Scott, told her that Plaintiff had beaten her, and asked Scott to come pick her up.  Valdez was nearby and saw that Claudia was covering her face with her hand.  Valdez thought that this behavior was suspicious, but had to leave the scene to respond to an unrelated call.  He later returned to the area with Renteria, where he again saw Claudia near the convenience store.  She appeared to be waiting for someone or something.  Renteria noticed that Claudia appeared to have bruises on her face, a black eye, and red marks on her neck that looked consistent with her having been choked.  Claudia was sobbing and breathing heavily.  The officers asked Claudia of she was alright; she said that she was.  One of them asked Claudia if she had seen her face; she said that she had.  They continued to ask questions and finally threatened to arrest Claudia if she did not tell them what had happened.  Instead of telling the truth, Claudia told Renteria and Valdez that Plaintiff had hit her.  Renteria and Valdez said that they wanted Claudia to press charges, but Claudia said that she did not want to.  They told Claudia that she had no choice.

During this course of events, Erin Scott arrived by car at the convenience store where Valdez, Renteria, and Claudia were standing.  Scott told the officers that Claudia had telephoned her and asked Scott to pick her up because her mother had beaten her.   Valdez called the Las Cruces Fire Department.  Medics arrived and examined Claudia.  Their records state that Claudia did not have a chief complaint, that she had a history of diabetes and hemophelia, that she was oriented to time and place, that she had not lost consciousness, and that she stated that she was not in any pain, did not want to be touched, did not want to go to the hospital, and did not want medical attention.  The medics noted bruising on Claudia's face, neck, and breast, but no swelling in the areas of the bruises.  They also noted that the bruising "appeared suspicious," but the report stops short of saying that the

bruises were fabricated.  Enrique Murgia, a paramedic on the scene, testified by affidavit that the appearance of the discoloration on Claudia's skin led him to believe that the injuries may not have been genuine.  However, he did not offer this opinion to Renteria and Valdez because he was focused on the patient.  Apparently, Valdez and Renteria did not ask the paramedics about the nature or extent of Claudia's injuries either.

Before leaving the area near the convenience store, Valdez took pictures of Claudia's face and neck.  Those photographs appear to depict significant bruising.  Renteria and Valdez then went to Plaintiff's home, where they arrived at approximately 11:30 p.m.  They rang the doorbell and Plaintiff's husband, Duncan Smith ("Duncan") answered the door.  Renteria told Duncan, "We are here to arrest [Plaintiff]; we have all the evidence we need.  We will listen to your side of the story but are going to arrest [Plaintiff]."  Plaintiff awoke and went to the door as well, where she found Duncan talking to Renteria.  Plaintiff allowed Renteria and Valdez to enter the home.  Renteria asked Plaintiff if she had physical contact with Claudia earlier that evening.  Plaintiff said that she had not, and Renteria informed her that Claudia had bruises on her body.  Plaintiff told Renteria that Claudia had diabetes and that she might have used makeup to create the appearance of bruises, or Claudia's boyfriend may have hurt her.  Renteria checked Plaintiff's body and hands for injuries or bruises, but found none.  Plaintiff did tell Renteria that earlier that evening she had told Claudia that if she continued to violate her curfew she might have to look for another place to live.  Renteria questioned Duncan, who told Renteria that nothing had happened between Plaintiff and Claudia, that there had been no fight between them, that he did not see bruising on Claudia's face earlier that evening, and that he would not doubt that Claudia could have caused injury to herself. Valdez interviewed Plaintiff's elder daughter Juniper, Claudia's sister, who lived with her parents at the time of these

6

events.  Juniper said that she did not see her mother hit or harm Claudia that evening.  However, in response to questioning Juniper said that while her father would never get physical with one of his children, her mother (Plaintiff) would.  Juniper told Valdez that on one occasion in the home, her mother had become enraged with her, grabbed her by the throat, and began shaking her.

Renteria and Valdez then conducted a warrantless arrest of Plaintiff in her home.[1]  The Defendants took Plaintiff to the Las Cruces Police Department for booking, and then had her transported to the Doña Ana County Detention Center, where she was held on a $5,000 bond.  On July 31, 2004, Renteria filed a criminal complaint against Plaintiff for the charge of battery against a household member.  Thereafter, Plaintiff tried to contact Renteria by phone and email to inform him that Claudia admitted that Plaintiff had not touched or harmed her, but he never responded. Apparently Claudia made similar attempts to contact Renteria.  On September 23, 2004, Plaintiff wrote to Renteria and asked him to dismiss the case.  The municipal court held a pretrial conference on October 4, 2004, at which Plaintiff told Renteria that Claudia was trying to contact him to inform him that she had faked her injuries.  Renteria told Plaintiff to plead guilty and go to counseling, and refused to drop the charges.  Then, on October 18, 2004, the date of the trial on the charges against Plaintiff, Renteria failed to appear in court.  The Assistant City Attorney for the City of Las Cruces dismissed the case without prejudice.

On September 27, 2004, Claudia executed an affidavit in which she admitted that she was angry at her mother on the night of July 30, 2004 and that she "decided to play a malicious joke and

---

[1] Valdez contends that when he told Duncan that he was arresting Plaintiff, Duncan shrugged his shoulders and said, "She's getting better."  Valdez interpreted this to mean that Plaintiff had a problem with domestic violence but that it was improving.  According to Valdez, Duncan also stated that in the past his wife had become angry and had thrown objects around the house.  However, in his affidavit Duncan expressly denies making any of these statements.

pretend that [her] mom had hit me just to show my friends."

Plaintiff has two remaining causes of action.  In Count I, she asserts a claim under 42 U.S.C. § 1983 against the individual defendants for unlawful arrest without probable cause in violation of the Fourth and Fourteenth Amendments, Complaint at ¶¶ 37-39.  Count III asserts a tort claim for malicious abuse of process against all Defendants.  Defendants have moved for summary judgment on both claims, while Plaintiff moves for summary judgment on Count I only.

## DISCUSSION

## I.  VIOLATION OF THE FOURTH AMENDMENT UNDER § 1983

Count I of the Complaint asserts a claim for violation of Plaintiff's right to be free from unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff contends that Defendants Renteria and Valdez violated her constitutional rights in two ways: first, by arresting her without probable cause, and second, by arresting her for a misdemeanor in her own home without a warrant.  Then, Plaintiff argues that her rights were clearly established such that a reasonable person in Renteria and Valdez's position would have known he was violating the law. The Court will address each argument in turn.

### A.    Violation of Plaintiff's Constitutional Rights

#### 1.    Probable Cause for Arrest

Plaintiff argues that the Defendants violated her constitutional rights by arresting her for a misdemeanor domestic violence charge without probable cause.  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The Supreme Court further stated in *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), that "[t]he

8

probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." As the Supreme Court has explained, the substance of probable cause "is a reasonable ground for belief of guilt. . . [I]t has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal quotations omitted). "When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff. Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).

Considering the totality of the circumstances, the Court concludes that Renteria and Valdez reasonably concluded that they had probable cause to arrest Plaintiff. While it is true that both Plaintiff and Duncan denied that Plaintiff had hurt Claudia, and the police officers found no physical evidence of a fight on Plaintiff's person, at the time of the arrest Renteria and Valdez did possess significant information to support a conclusion that Plaintiff had battered Claudia. That information includes (1) the fact that Claudia was sobbing and emotionally distressed when the officers first approached her, (2) Claudia's statement that Plaintiff had hit her, (3) the corroborating statement of Erin Scott who said that Claudia asked her to pick her up because Plaintiff had beaten her, (4) the apparent bruises on Claudia's head and neck, shown in photographs, and (5) Juniper Smith's statement that her mother had battered her in the past. Under the totality of the circumstances, the Court concludes that Renteria and Valdez could have reasonably concluded that they had probable

9

cause to arrest Plaintiff.

Plaintiff argues that the totality of the evidence weighs against a finding of probable cause. First, she contends that Claudia's statement to the police was coerced and therefore unreliable. However, Claudia admits that she planned to tell the false story that her mother had hit her even before she left the house. This preplanning significantly undermines Plaintiff's claim that Renteria and Valdez placed so much pressure on Claudia that she was forced to make up a story to explain her injuries, because Claudia had already prefabricated the story. Furthermore, Claudia's statement to Renteria and Valdez was corroborated by Claudia's independent statement to Erin Scott (regarding which Plaintiff makes no claim of coercion), and was therefore reliable given what the officers knew at the time. Claudia's distraught emotional state lent further credence to her accusations against Plaintiff. "[L]aw enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable." *Walker v. City of Okla. City*, 2000 WL 135166 at **6 (10th Cir. Feb. 7, 2000) (unpublished) (quoting *Clay v. Conlee*, 815 F.2d 1164, 1168 (8th Cir. 1987)); *United States v. Harness*, 453 F.3d 752 (6th Cir. 2006) (holding that a warrantless arrest was supported by probable cause where police had spoken directly to the victim and "nothing about the allegation itself cast doubt on the victim's reliability," and another witnesses confirmed that there was a "window of time within which the alleged sexual assault could have occurred").

Plaintiff also points to the doubts expressed by paramedic Enrique Murguia regarding the authenticity of Claudia's injuries. However, during the investigation at the convenience store, Murguia had both the opportunity to observe Claudia and the training to recognize that her injuries

may have been spurious; Renteria and Valdez did not.[2]  Plaintiff argues that, even though Murguia failed to offer his opinion regarding the authenticity of Claudia's injuries to the police at the convenience store, after Plaintiff denied hitting Claudia the officers then had a duty to go out and find Murguia in order to obtain his opinion regarding Claudia's bruises.  Citing *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998) and *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), Plaintiff argues that Renteria and Valdez ignored easily accessible evidence that would have exonerated her.   In *Baptiste*, the plaintiff alleged that she had been arrested for shoplifting without probable cause.  In holding that the defendant police officers were not entitled to summary judgment on qualified immunity grounds, the Tenth Circuit noted that the one of them had viewed but discounted a videotape which depicted the alleged crime, relying solely on the eyewitness accounts of store security guards.  The court observed that the videotape was insufficient as a matter of law to establish probable cause to arrest the plaintiff, *Baptiste*, 147 F.3d at 1257, and concluded that "police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation." *Id.* at 1259. *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), *cert. granted and vacated on other grounds sub nom. City of Lawton, Okla. v. Lusby*, 474 U.S. 805 (1985), *aff'd after reconsideration*, 796 F.2d 1307 (10th Cir.1986), is another shoplifting case.  There, the Tenth Circuit considered whether an officer may rely solely on the statements of a witness (in that case, a store manager), without conducting an independent investigation, to establish probable cause for a

---

[2] It is worth noting that the paramedics merely stated in their report that Claudia's injuries were "suspicious."  They did not go so far as to deem them artificial, perhaps because their examination may have been hindered by Claudia's refusal to be touched or treated in any way. Thus, it is not clear how much concrete information Renteria and Valdez would have obtained from interviewing Murguia.

warrantless arrest.  The Court concluded that without more, the defendant officers lacked probable cause to arrest the plaintiff-shopper.

However, the circumstances in those cases are distinguishable from the facts presented here. In *Baptiste*, there was an actual videotape of the alleged crime of which the officers were aware, and even had viewed, but ultimately ignored in making their probable cause determination.  In *Lusby*, the defendant officers conducted an arrest solely on the basis of the store manager's statement, and failed to conduct their own investigation by interviewing the cashier or other customers, or by examining physical evidence.  In this case, in contrast, the officers had before them visible evidence of domestic violence, in the form of apparent bruises, along with corroborating statements from the victim and the victim's friend.  The police also had an inculpating statement from Plaintiff's daughter that led them to believe that Plaintiff had a history of violence against family members.  While the officers later gathered evidence of Plaintiff's innocence, including the Plaintiff's assertion that she had not committed the crime, that is neither unusual nor determinative.  Officers investigating an alleged incident of domestic violence frequently must confront conflicting statements and disputed versions of events, along with denials by the suspect.  What Plaintiff proposes in this case is effectively a requirement that, after an accused denies participating in a domestic violence for which there is physical evidence and corroborating statements, police officers find the treating paramedic or doctor who has already left the scene in order to verify the authenticity of the victim's visible injuries.  The Court does not believe that, under the circumstances of this case, the standard of reasonableness imposed upon Renteria and Valdez would require them to take that action prior to arresting Plaintiff.

Finally, Plaintiff points to the statements by her, Duncan, and Juniper to the effect that Plaintiff had not touched Claudia on the evening in question.  However, clearly established law neither

12

requires an officer to lend credence to a suspect's explanation of innocence nor requires the officer to forgo arrest until the incident can be more fully investigated.  *See e.g., Romero*, 45 F.3d at 1476-78.

Taking the totality of circumstances into account, the Court concludes that Renteria and Valdez acted reasonably in believing that they had probable cause to arrest Plaintiff for a battery on Claudia.

2.      <i>Warrantless Arrest in Plaintiff's Home</i>

Plaintiff also contends that the Defendants violated clearly established law providing that police officers may not arrest a citizen in her home for a suspected misdemeanor offense, absent exigent circumstances.   In support of her position, Plaintiff cites *Payton v. New York*, 445 U.S. 573 (1980) and *Welsh v. Wisconsin*, 466 U.S. 740 (1984), along with *Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994).   However, Plaintiff has overlooked a significant feature of the holdings in those cases, in which the courts found that the Fourth Amendment does not authorize police officers to effect *nonconsensual*, warrantless entries into citizens' homes.   However, provided that the arrest is supported by probable cause, the Fourth Amendment does permit a warrantless arrest in the suspect's home if law enforcement officers have valid consent to enter the dwelling.

In *Payton*, the appellants challenged the constitutionality of New York statutes authorizing police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest.   In each of the appeals, police officers, acting with probable cause but without warrants, had gone to the appellant's residence to arrest the appellant on a felony charge and had entered the premises without the consent of any occupant.   In each case, the New York trial judge held that the warrantless entry was authorized by New York statutes and refused to suppress evidence

that was seized upon the entry.  The Supreme Court reversed, holding that the Fourth Amendment "prohibits the police from making a warrantless and *nonconsensual* entry into a suspect's home in order to make a routine felony arrest."  *Payton*, 445 U.S. at 576 (emphasis added).

Similarly, in *Welsh* a witness observed a car that was being driven erratically and that eventually swerved off the road, coming to a stop in a field without causing damage to any person or property.  Ignoring the witness' suggestion that he wait for assistance in removing his car, the driver walked away from the scene.  When the police arrived, the witness told them that the driver was either very inebriated or very sick. After checking the car's registration, the police, without obtaining a warrant, proceeded to the driver's nearby home at approximately 9:00 p.m.  They gained entry when the driver's stepdaughter answered the door and found him lying naked in bed.  The police then arrested him for driving a motor vehicle while under the influence of an intoxicant in violation of Wisconsin law.  The Supreme Court held that the warrantless, nighttime entry of petitioner's home to arrest him for a civil traffic offense not punishable by imprisonment was prohibited by the special protection afforded the individual in his home by the Fourth Amendment. *Welsh*, 466 U.S. at 748-50.  However, the Supreme Court's opinion expressly turned on its assumption that the police officers lacked valid consent to enter the home, *id*. at 743 n.1, 744 n. 4, and 747 n. 8, a fact issue never resolved by the trial court.  Similarly, in *Howard* the police arrested the plaintiff in her home for leaving the scene of an accident and for careless driving.  The Tenth Circuit's analysis in *Howard* focused on two areas: whether the officers had probable cause to arrest the plaintiff, and whether the manner of the arrest—in plaintiff's home and without a warrant—was proper.  34 F.3d at 981.  Again, the court assumed that the officers lacked valid consent to enter the home: "If the district court finds [the police] received consent to enter [plaintiff's] home, the absence

14

of a warrant is not fatal to [the police officer's] defense." *Id*. at 981 n. 2.  As the Supreme Court

succinctly stated in *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), an opinion issued after both

*Payton* and *Welsh*,  "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's

home, whether to make an arrest or to search for specific objects. The prohibition does not apply,

however, to situations in which voluntary consent has been obtained, either from the individual whose

property is searched, or from a third party who possesses common authority over the premises."

        In this case, the record is devoid of evidence that Defendants Renteria and Valdez lacked valid

consent to enter Plaintiff's home on the night they arrested her.  Valdez's affidavit specifically states

that Plaintiff let him into her home.  Neither Plaintiff's nor Duncan's affidavit contradicts that

statement, nor has Plaintiff presented any evidence to indicate that the officers entered Plaintiff's

house without consent.  Thus, the record contains no evidence that Renteria and Valdez violated the

clearly established principles set forth in *Payton*, *Welsh*, or *Howard* by arresting Plaintiff at her home.

As a result, the Court concludes that Defendants Renteria and Valdez are entitled to qualified

immunity on Plaintiff's claim for a constitutional violation in Count I of the Complaint.  Defendants'

motion for summary judgment will be granted, and Plaintiff's cross motion for summary judgment

will be denied.

        **B.      <u>Clearly Established Law</u>**

        Having found that Defendants did not violate Plaintiff's constitutional rights, the Court need

not reach this second prong of the qualified immunity test.

**II.      MALICIOUS ABUSE OF PROCESS**

        In order to prevail on a claim for malicious abuse of process, the plaintiff must allege and

prove the following elements: (1) the initiation of judicial proceedings against the plaintiff by the

15

defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages. *DeVaney v. Thriftway Marketing Corp.*, 1998-NMSC-001, ¶ 17, 124 N.M. 512, 518, 953 P.2d 277, 283. "In short, there must be both a misuse of the power of the judiciary by a litigant and a malicious motive." *Id.* In *Devaney*, the Supreme Court made clear that the first required element for the tort is the filing of a complaint and hence the misuse of the power of the judiciary. 1998-NMSC-001, ¶¶ 17-18, 20. It is undisputed that Renteria, not Valdez, filed the criminal complaint against Plaintiff. *See* criminal complaint, attached as Ex. 1 to Plaintiff's Affidavit; *see also* Complaint at ¶ 32. Though the Court is aware that a non-litigant may be liable for this tort if he is an active participant in the underlying proceeding, *Valles v. Silverman*, 2004-NMCA-019, ¶ 15, 135 N.M. 91, Plaintiff has made no showing that Valdez was an active participant in the criminal proceedings against her. Because Valdez did not initiate judicial proceedings against Plaintiff, he is entitled to summary judgment on Plaintiff's claim for malicious abuse of process.

The question remains whether this claim shall go forward as to Renteria and the City Commissioners of the City of Las Cruces. It is undisputed that Renteria initiated judicial proceedings against Plaintiff, thereby satisfying the first element of the claim. However, a separate and independent element of the tort is that "there must be an overt act that is irregular or improper in the normal course of proceedings." *Devaney,* 1998-NMSC-001 at ¶ 21. A plaintiff may satisfy this element, the misuse of process, in one of two ways: by demonstrating that the defendant lacked probable cause to file the complaint, or by showing that the defendant engaged in some sort of

16

procedural impropriety suggesting extortion, delay, or harassment. *Id*. at ¶¶ 20-22, 28.[3]   The Court has already concluded that Renteria and Valdez had probable cause to arrest Plaintiff, and therefore Renteria had probable cause to file his criminal complaint the following day.   Thus, Plaintiff may satisfy the second element of the tort only by showing that Renteria committed a procedural impropriety in prosecuting the claim against her.   A procedural impropriety under the tort of malicious abuse of process might arise if there was an improper use of criminal or civil process in a manner not contemplated by law. *Id*. at ¶ 28; *Weststar Mortg. Corp. v. Jackson*, 2003-NMSC-002, ¶ 20, 133 N.M. 114.   There is no liability when the defendant in an abuse of process claim has done nothing more than carry out the process to its authorized conclusion, even if done with bad intentions. *Id*. at ¶ 20.   In this case, Plaintiff does not offer any evidence to prove that Renteria performed any wrongful act during the course of the criminal proceeding against her.   She claims that he refused to dismiss the claims against her, that he ignored hers and Claudia's attempts to reach him in order to convey exculpatory evidence, that he told her to go to counseling, and that he failed to appear in court on the day of trial.   However, none of these constitutes a wrongful act by Renteria, and therefore Plaintiff fails to satisfy the second element of the tort of malicious abuse of process.

Similarly, the Court concludes that Plaintiff has failed to establish the existence of a genuine issue of fact on the third element of the claim, that the defendant initiated the legal proceedings primarily to accomplish an illegitimate end, that is, "to accomplish a purpose for which [the legal

---

[3] With regard to this second element of the tort, the New Mexico Supreme Court has warned that "we must construe the tort of malicious  abuse of process narrowly in order to protect the right of access to the courts." *Id*. ¶ 19.   The court also warned that "[t]he lack of probable cause must be manifest" in order to establish that the filing of a complaint constituted an improper, overt act in the use of process necessary to establish the second element of the tort of malicious abuse of process. *Id*. ¶ 22.

process] is not designed." *DeVaney*, 1998-NMSC-001, ¶ 29.  To prove this element, a plaintiff must show that the defendant did more than act with ill will or spite.  *Id*.  In *DeVaney*, the New Mexico Supreme Court stated that neither lack of probable cause nor an improper purpose created an illegitimate end for a legal proceeding, although they could be used to support an inference of an improper purpose.  *Id.* ¶ 30.  Here, Plaintiff has not presented evidence from which the jury could infer that Renteria did not believe in her guilt.  Indeed, his comment to Plaintiff that she should "get counseling" would support an inference that he believed Plaintiff to be guilty.  Similarly, the record contains no evidence to support an inference that Renteria filed the criminal complaint out of hostility or ill will toward Plaintiff, or that he filed the criminal complaint for the purpose of obtaining some sort of private advantage for himself.  Therefore, the Court concludes that Plaintiff has failed to satisfy the third element of the tort as well.

Thus, all Defendants are entitled to summary judgment on Count III of Plaintiff's Complaint.

**IT IS THEREFORE ORDERED** that Defendants' *Motion for Summary Judgment* [Doc. No. 32] is **GRANTED**, and *Plaintiff's Motion for Partial Summary Judgment* [Doc. No. 39] is **DENIED**.

**UNITED STATES DISTRICT JUDGE**